IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:05CR381 |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND |
| ) | |
| RICHARD D. MARASCO and ) | |
| ANGELA D. HARMS, ) | RECOMMENDATION |
| ) | |
| Defendants. ) | |

This matter is before the court on the motion of defendant Richard D. Marasco (Marasco) (Filing No. 24) to suppress all evidence seized from the search of a pick-up truck on March 27, 2005, in Plattsmouth, Nebraska, from the search of the residence at 720 1st Avenue on May 20, 2005, in Plattsmouth, Nebraska, and from the search of a motel room at Offutt Motor Court on August 24, 2005. Defendant Angela D. Harms (Harms) seeks to suppress all evidence seized from the search of a motel room at Offutt Motor Court on August 24, 2005, and any statements she may have made to law enforcement officers on August 24, 2005 (Filing No. 26). Both Marasco and Harms are charged in an Indictment with a conspiracy to manufacture in excess of 50 grams of methamphetamine in violation of 21 U.S.C. § 846 (Count I), the manufacture of more than 5 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) (Count II), and the possession of equipment and materials to manufacture methamphetamine in violation of 21 U.S.C. § 843(a)(6) (Count III).

The court held an evidentiary hearing on the motions to suppress on February 17, 2006. Marasco was represented by Federal Public Defender David R. Stickman and Jay W. Mez. Harms was represented by John D. McDermott. The United States was represented by Assistant U.S. Attorney Thomas J. Kangior. During the hearing, the court heard the testimony of Officer Andrew Kennan (Officer Kennan) of the Plattsmouth, Nebraska Police Department, Sergeant Robert Eric Wood (Sergeant Wood) and Detective Zeb Simones (Detective Simones) of the Bellevue, Nebraska Police Department, and the defendant Marasco. The court received into evidence an application and affidavit for a

search warrant and search warrant (Exhibit 1). A transcript (TR.) was prepared and filed in this matter on February 24, 2006 (Filing No. 37).

On March 22, 2006, the U.S. Supreme Court decided the case of **Georgia v. Randolph**, No. 04-1067, 547 U.S. ___ , 2006 WL 707380 (Mar. 22, 2006), wherein the Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to police by another resident." **Georgia v. Randolph**, slip op. at 16. Since this precise issue was before the court in the instant case concerning the search of Room 12 of the Offutt Motor Court on August 24, 2005, the court ordered a supplemental evidentiary hearing on the motions to suppress by defendants Marasco and Harms (Filing Nos. 24 and 26). At such hearing, the government was directed to present evidence as to what evidence was seized from the motel room and the location within the room where such evidence was seized. All parties were permitted to present such further evidence and argument as they deemed appropriate in light of the decision of **Georgia v. Randolph**.

A supplemental hearing was held on March 29, 2006. Marasco and Harms were present with their counsel as was counsel for the government. The court heard additional testimony from Sergeant Wood and received into evidence a search inventory form (Exhibit 2). A transcript (TR.) of the supplemental hearing was filed on April 10, 2006 (Filing No. 43). The supplemental hearing transcript was prepared with continuous pagination of the original transcript (Filing No. 37). There was no post-hearing briefing.

## FINDINGS OF FACT

Officer Kennan has been employed as a police officer for the City of Plattsmouth, Nebraska, since October 2002 (TR. 7). He has been assigned to the Metro Clandestine Lab Team for four years and has been certified as a methamphetamine lab specialist in a 40-hour class through the Nebraska State Patrol (TR. 8). Officer Kennan has attended numerous training sessions on the recognition of methamphetamine and has manufactured methamphetamine as part of that training (TR. 8). In such training, Officer Kennan has worked with anhydrous ammonia and is familiar with the odor of anhydrous ammonia (TR.

8).  Officer Kennan testified he had encountered approximately thirty methamphetamine labs in the course of his duties as a law enforcement officer (TR. 8).

Officer Kennan was in uniform and on patrol in a marked patrol vehicle at approximately 2:00 a.m. on March 27, 2005 (TR. 8).  Officer Kennan observed a pick-up truck crossing Chicago Avenue onto Second Avenue headed northbound on North 8th Street in Plattsmouth (TR. 9).  Officer Kennan believed the driver to be Sean Mauk (Mauk), a person whose license had been suspended for two years (TR. 9).  Officer Kennan radioed into dispatch requesting dispatch check to see if Mauk was still on suspension (TR. 9).  Dispatch radioed back that Mauk was still on suspension (TR. 10).  Officer Kennan began following the pick-up and radioed in the license plate of the pick-up once Officer Kennan closed nearer to the pick-up (TR. 10).  As Officer Kennan was following the pick-up, the pick-up turned into an alley between First and Main Streets and parked (TR. 10).  The pick-up was parked in a residential area behind a residence in which Marasco was living (TR. 15).  Officer Kennan drove his patrol vehicle into the entrance of the alley, parked, and got out of the patrol vehicle (TR. 10).  Officer Kennan did not activate any flashing lights or sirens on his patrol vehicle (TR. 10-11).  As Officer Kennan approached the parked pick-up, he shined his flashlight on the cab of the pick-up and recognized the driver to be Marasco from prior contacts with Marasco (TR. 11).  As Officer Kennan walked toward the pick-up, he radioed in a request to dispatch to see if there were any warrants for Marasco (TR. 19).  Apparently, there were none (TR. 19).  Marasco was getting out of the pick-up after having shut the engine off (TR. 11).  Officer Kennan approached Marasco and stated: "Mr. Marasco, I apologize. I actually thought that you were somebody else that was driving under suspension" (TR. 11).  As Officer Kennan turned to walk away from the pick-up and go back to his patrol vehicle and leave, Officer Kennan got a strong odor of anhydrous ammonia coming from the bed of the pick-up (TR. 12).  The odor stung Officer Kennan's eyes and nostrils (TR. 12).

Since Officer Kennan associated the odor of anhydrous ammonia with the odor associated with methamphetamine labs, Officer Kennan asked Marasco what was in the pick-up that smelled like anhydrous ammonia (TR. 12).  Marasco stated he did not know as the truck was not his (TR. 12).  Marasco testified that on March 27, 2005, he was driving

3

the pick-up searched by Officer Kennan (TR. 31). The pick-up truck belonged to his roommate, Jed Beuchler, and Marasco had permission from Beuchler to drive the pick-up (TR. 31-32).

Officer Kennan asked Marasco to step back to Officer Kennan's patrol vehicle (TR. 12). At this point in time, another Plattsmouth patrol vehicle driven by Officer John Hardy (Officer Hardy) had arrived and parked next to Officer Kennan's patrol vehicle (TR. 13). The positioning of the police patrol vehicles blocked the egress from the alley onto the street (TR. 17). Marasco walked to Officer Kennan's patrol vehicle and stood next to Officer Hardy (TR. 13). Officer Kennan flashed his flashlight into the open bed of the parked pick-up and observed a black trash bag, a Rubbermaid tote container, and a black bucket containing a bag of Morton rock salt (TR. 13). Officer Kennan believed the rock salt, as well as the other items in the pick-up, to be a precursor used in manufacturing methamphetamine (TR. 13; 22). Officer Kennan carefully opened the black bag to see if the bag was the source of the anhydrous ammonia odor (TR. 13). Officer Kennan testified he was concerned for his and others' safety if anhydrous ammonia was not contained properly (TR. 13). Inside the bag, Officer Kennan found a five gallon white bucket with a tinted blue liquid (TR. 14). There was a white sediment in the liquid and the odor of anhydrous ammonia was stronger (TR. 14). At this point, Officer Kennan believed he observed the components of an active methamphetamine lab and seized the items (TR. 26).

On May 19, 2005, Detective David Walker (Detective Walker) of the Plattsmouth Police Department applied for a search warrant for the premises at 720 1st Avenue in Plattsmouth, Nebraska (Exhibit 1). Therein Detective Walker set forth his experience as a certified LAB Technician, Site Safety Officer, and his assignment to the Metro Clan Lab Team (Exhibit 1). Detective Walker detailed the specifics of a trash pull from the residence of 720 1st Avenue containing delineated items of drug and methamphetamine paraphernalia (Exhibit 1). Some of the items were tested and proved positive for the presence of methamphetamine (Exhibit 1). Detective Walker detailed the significance of the items seized as they may relate to methamphetamine trafficking (Exhibit 1). Based on the application and affidavit, a county judge in Cass County, Nebraska, issued a search

warrant for the premises (Exhibit 1). The search warrant was executed on May 20, 2005, and numerous items were seized as listed in the Return and Inventory attached to the search warrant (Exhibit 1).

On August 24, 2005, Sergeant Wood and members of his Special Investigations Unit (Unit) were driving around the city of Bellevue, Nebraska, looking for suspicious activity which may involve drug trafficking stemming from active narcotics investigations or complaints of narcotics activity (TR. 36). The Unit investigates narcotics cases, gun cases, and gang activity (TR. 36). The Unit started on Fort Crook Road to the south of the Old Towne area, and particularly at the Offutt Motor Court (TR. 36). Sergeant Wood was driving an unmarked police vehicle (TR. 37). Unit Detectives John Brazda, Zeb Simones, and Shaun McAlpin were in separate vehicles and participating in the operation (TR. 37). Sergeant Wood noticed a vehicle bearing 20-county license plates parked behind the Offutt Motor Court (TR. 37). The car raised Sergeant Wood's suspicions because the Unit previously recovered methamphetamine labs from this motel and several of those recoveries were from individuals from the Plattsmouth area in Cass County (20-county) (TR. 37-38).

Sergeant Wood called Detective Simones and requested Detective Simones to run the license plate observed by Sergeant Wood (TR. 38). Using his laptop computer which was connected to the statewide database, Detective Simones ran the license plate (TR. 38; 61). Detective Simones's check determined that the 20-county plates were registered to Richard Marasco of Plattsmouth, that there was an outstanding felony warrant for Marasco; and that Marasco had a past drug history (TR. 38-39; 61-62). Detective Simones contacted the Plattsmouth Police Department to determine who else other than Marasco could be driving the 20-county vehicle (TR. 39). When informed that Marasco had a son but that the son was in custody and that Marasco had previous arrests for manufacturing methamphetamine in Cass County, Sergeant Wood requested Detective Simones to meet with Sergeant Wood (TR. 39).

Detective Simones met with Sergeant Wood at the Offutt Motor Court, and Detective Simones was able to access booking photographs of Marasco on Detective Simones's laptop computer (TR. 40). At approximately 9:30 p.m., as the detectives were surveilling

the motel room at the Offutt Motor Court, a white Toyota 4Runner arrived and parked next to Marasco's vehicle (TR. 40). An older white male, later identified as Marasco, and a younger white female passenger, later identified as Harms, got out of the 4Runner and entered Room 12 of the motel (TR. 40-41). Sergeant Wood sent Detective Simones to the font desk of the motel to find out who was registered in Room 12 (TR. 41). Detective Simones learned from the manager of the motel that Marasco was not registered as one of the renters of the room (TR. 62). However, after being provided a description of Marasco, the motel manager suspected Marasco was in Room 12, which was rented by an Angela Harms (TR. 63). Detective Simones checked Harms's criminal history and determined that Harms owned a white Toyota 4Runner and Harms had a prior arrest for methamphetamine (TR. 63). Detective Simones then relayed this information to Sergeant Wood (TR. 63).

The officers, i.e., Sergeant Woods, Detectives Brazda, McAlpin and Simones of the Bellevue Police Department and Detective Dave Walker of the Plattsmouth Police Department, then converged on Room 12 of the Offutt Motor Court (TR. 42). Detective Simones knocked on the door which was answered by Marasco (TR. 42). Marasco was advised the officer had a warrant for Marasco's arrest and asked Marasco to step outside (TR. 64). Instead, Marasco stepped back into the room (TR. 42; 64). Sergeant Wood, Detective Simones, and another detective stepped into the room and placed handcuffs on Marasco (TR. 42). Sergeant Wood informed Marasco that Marasco was under arrest and asked Marasco if there was anything on him which might be dangerous (TR. 42-43). Marasco said no (TR. 43). Sergeant Wood than asked Marasco if there was anything that might be dangerous to the officers in the room, such as chemicals (TR. 42). Marasco stated he had some acid (TR. 43).

When the officers entered the room, Harms was seated in a chair (TR. 42). Detective Simones asked Harms to step outside, which she did (TR. 65). Detective McAlpin stood in the doorway while Detective Simones talked with Harms (TR. 65). Detective Simones asked Harms who rented the room (TR. 67). Harms told Detective Simones that she had rented the room but that Marasco recently went to the manager's office and paid for another week's rent (TR. 67). Harms said she and Marasco shared the

6

room equally and both could come and go as they pleased (TR. 67). Detective Simones asked Harms for permission to search the room (TR. 67). Harms stated she would rather not have the officers looking through her stuff (TR. 67-68; 100). Detective Simones relayed this information to Sergeant Wood (TR. 68).

While Detective Simones talked with Harms outside, Sergeant Wood searched Marasco's person incident to Marasco's arrest and some bags of methamphetamine were found (TR. 44; 54). Sergeant Wood advised Marasco of his **Miranda** rights using a **Miranda** advice card (TR. 44; 52). Sergeant Wood then asked Marasco if the officers could search the room and advised Marasco he did not have to give consent (TR. 44; 59). Marasco said they could search (TR. 44). Marasco also told Sergeant Wood that there was a gas generator as well as some acid in the room (TR. 44). Marasco did not appear to be under the influence of any drug, had no difficulty in understanding the officer's questions, and posed a friendly demeanor (TR. 45).

Detective Simones went back into the motel room and talked with Marasco (TR. 68). When asked who had a key to the room, Marasco stated he had the only key and kept the key with him at all times (TR. 68). Marasco said Harms had originally rented the room but that he actually paid for the room (TR. 68). Marasco said he and Harms shared the room and they both came and went from the room as they pleased (TR. 68).

Based on Marasco's consent to search, the officers searched the motel room (TR. 47). Numerous items of methamphetamine manufacturing paraphernalia, actual methamphetamine, syringes and other methamphetamine paraphernalia were found (TR. 48). A gray plastic container and plastic bags with methamphetamine were found in Marasco's front jeans' pocket (Exhibit 2 - Item W-1; TR. 95); black leather pouch with methamphetamine found in Marasco's front pocket ((Exhibit 2 - Item W-2; TR. 95); bag with methamphetamine and glass vial found on bed - the contents of the bag not readily apparent (Exhibit 2 - Item W-3; TR. 95); black tin containing 3 bags of methamphetamine and "tooter" found near a purse on the bed - items not observed until after the commencement of the search of the room (Exhibit 2 - Item W-4; TR. 95-96); three glass pipes, foil, and blue plastic scale with residue observed prior to the room search on the night stand (Exhibit 2 - Item W-5; TR. 89); container with some coffee filters found on the

night stand after the room search began (Exhibit 2 - Item W-6; TR. 96); used coffee filters with residue observed in plain view on a table (Exhibit 2 - Item W-7; TR. 90); two red buckets, plastic funnels and coffee filters found in a cabinet under the sink at the north wall after the room search began (Exhibit 2 - Item W-8; TR. 96); blue purse containing numerous unused baggies found on the bed after the room search began (Exhibit 2 - Item W-9; TR. 97); three foils, two used and one with methamphetamine found on the floor by night stand found after the room search began (Exhibit 2 - Item W-10; TR. 97); bag containing numerous unused baggies found in a side pocket of a duffel bag under the TV stand after the room search began (Exhibit 2 - Item W-11; 98); can of Sunnyside acetone found on the floor near the TV stand after the room search began (Exhibit 2 - Item W-12; TR. 98); electrical stir stick, plastic spoon, coffee filters, and a glass jar of Coleron fuel found on the top shelf above the sink after the room search began (Exhibit 2 - Items W-13 and W-14; TR. 98); boxes of pseudoephedrine and an empty can of acetone in a garbage sack found under the TV table after the room search began (Exhibit 2 - Items W-15 and W-16; TR. 98); plastic sports bottle with tubing and sample found under the sink after the room search began (Exhibit 2 - Items W-17 and W-17A; TR. 98); black/blue zippered pouch with syringes found in the purse on the bed after the room search began (Exhibit 2 - Item W-18; TR. 93-94); plastic 2-quart pitcher with blue liquid observed next to the sink along the north wall prior to the start of the room search (Exhibit 2 - Items W-19 and W-19A; TR. 90); bottle containing acid found under the sink after the room search began (Exhibit 2 - Item W-20); and a black bag containing numerous syringes found in the purse on the bed after the room search began (Exhibit 2 - Item W-21).

Detective Simones was informed that there were drug related items in the room that could be linked to Harms (TR. 68). Detective Simones then went back outside and advised Harms of her *Miranda* rights from a card in his wallet (TR. 68-69; 73). Thereafter, Harms made incriminating statements (TR. 72).

## LEGAL ANALYSIS

### A.  Search of the Pick-up on March 27, 2005

Marasco challenges the search of the pick-up on March 27, 2005, by officers of the Plattsmouth Police Department.  He asserts the search was conducted without a warrant, without Marasco's consent, and without probable cause.  The government challenges Marasco's standing to object to the search of the pick-up.  However, the government also asserts that any detention of Marasco and search of the pick-up was justified by **Terry v. Ohio**, 392 U.S. 1 (1968), by having probable cause to believe an offense was being committed, or by the presence of exigent circumstances warranting the search.

### 1.  Standing

To claim Fourth Amendment protection, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.  **Minnesota v. Carter**, 525 U.S. 83, 88 (1998); **United States v. Boyster**, 436 F.3d 986, 992 (8th Cir. 2006).  The reasonableness of the expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." **Rakas v. Illinois**, 439 U.S. 128, 143-44 n.12 (1978); **see also Smith v. Maryland**, 442 U.S. 735, 740-41 (1979).  "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally."  **United States v. Barragan**, 379 F.3d 524, 529-30 (8th Cir. 2004) (**quoting United States v. Gomez**, 16 F.3d 254, 256 (8th Cir. 1994)).

The Eighth Circuit has recognized that:

> The Supreme Court has enunciated a two part test to determine whether a person has a legitimate expectation of privacy in the place searched or the object seized.  A court must determine:  (1) whether the petitioner has asserted a subjective expectation of privacy, and (2) whether the petitioner's subjective expectation is objectively reasonable.

**United States v. Stallings**, 28 F.3d 58, 60 (8th Cir. 1994) (internal citations omitted). "Fourth Amendment rights are personal rights that may not be asserted vicariously."

***Barragan***, 379 F.3d at 529. Therefore, the court "must first determine whether [the defendant] had a legitimate expectation of privacy in the area searched or the item seized." ***Gomez***, 16 F.3d at 256. The Eighth Circuit has explained:

> Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

***Id.***

The pick-up in issue was owned by and registered to Jerry Beuchler and was parked behind a house at 720 1st Avenue in Plattsmouth where Beuchler resided with Marasco. Marasco testified he had Beuchler's permission to drive the pick-up on the evening of March 27, 2005. Marasco further testified he had driven the pick-up on several occasions previous to March 27th and did mechanical work on the pick-up for Beuchler. The government did not contradict Marasco's assertions. The court finds Marasco has carried his burden he had a reasonable expectation of privacy in the pick-up on the evening of March 27, 2005.

### 2.  Encounter with Marasco in the Alley

Encounters between the police and citizens fall into three general categories:

(1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, **see, e.g., *Florida v. Bostick***, 501 U.S. 429 (1991); ***Florida v. Royer***, 460 U.S. 491 (1983); ***United States v. Angell***, 11 F.3d 806 (8th Cir. 1993), **cert. denied**, 512 U.S. 1239 (1994); ***United States v. Robinson***, 984 F.2d 911 (8th Cir. 1993); ***United States v. Gilbert***, 936 F.2d 377 (8th Cir. 1991);

(2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, **see, e.g., *United States v. Sokolow***, 490 U.S. 1 (1989); ***Reid v. Georgia***, 448 U.S. 438 (1980); ***Terry v. Ohio***, 392 U.S. 1 (1968); ***United States v.***

*Weaver*, 966 F.2d 391 (8th Cir.), **cert. denied**, 506 U.S. 1040 (1992); *United States v. Galvan*, 953 F.2d 1098 (8th Cir. 1992); and

(3) physical arrests, which must be supported by probable cause. *U.S. Const. amend. IV.*

In this case, Officer Kennan did not stop Marasco while Marasco was driving the pick-up. Officer Kennan encountered Marasco after Marasco had driven into the alley and parked the pick-up behind the residence in the alley. Officer Kennan met Marasco after Marasco had gotten out of the pick-up. While Officer Kennan's police cruiser may have been parked at the entrance to the alley which would have impeded Marasco if Marasco had wanted to leave in the pick-up, the emergency lights were not engaged on Officer Kennan's police cruiser and there was no evidence Marasco wanted to get back into the pick-up and leave the area.

"Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry*, 392 U.S. at 19 n.16. A seizure does not occur when a police officer approaches an individual and merely questions him or asks to examine his identification -- so long as the officer does not convey a message that compliance with his request is required. *Bostick*, 501 U.S. at 434; **see also** *United States v. Drayton*, 536 U.S. 194, 200-01 (2002). If "a reasonable person would feel free 'to disregard the police and go about his business,'" the encounter is consensual and no reasonable suspicion is required. *Id.* (**quoting** *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). "It is well established that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . [and] putting questions to him if the person is willing to listen." *United States v. Green*, 52 F.3d 194, 198 (8th Cir. 1995) (citations omitted). A request for information does not turn consensual questioning into an investigatory stop. *United States v. Pena-Saiz*, 161 F.3d 1175, 1177 (8th Cir. 1998); *United States v. Poitier*, 818 F.2d 679, 682-83 (8th Cir. 1987), **cert. denied**, 484 U.S. 1006 (1988).

In this case Officer Kennan apologized to Marasco as he approached Marasco and was about to walk away before detecting the anhydrous ammonia odor coming from the bed of the pick-up. Accordingly, the court finds the initial encounter between Officer

11

Kennan on the evening of March 27, 2005, was purely consensual and not an investigatory stop or seizure.

### 3.  Detection of the Anhydrous Ammonia Odor

Officer Kennan testified as to his experience in investigating methamphetamine labs. He further testified he detected the odor of anhydrous ammonia as he walked past the bed of the pick-up Marasco had parked in the alley. Such detection constituted reasonable suspicion of ongoing criminal activity and justified his further looking into the open bed of the pick-up.  **United States v. Kleinholz**, 339 F.3d 674, 677 (8th Cir. 2003) (smell of ether alone supported probable cause to search); **United States v. Clayton**, 210 F.3d 841, 845 (8th Cir. 2000) (noting "plain smell" rule supporting search after odor associated with methamphetamine production). Officer Kennan's observation of the amalgamation of materials which were in plain view in the bed of the pick-up together with the anhydrous ammonia odor constituted probable cause of methamphetamine manufacturing and justified his looking into the closed bag in the bed of the pick-up. Consequently, Officer Kennan's seizure of the materials in the pick-up bed was justified under the Fourth Amendment based upon probable cause.  **See Pennsylvania v. Labron**, 518 U.S. 938, 940 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.").

### 4.  Exigent Circumstances

The government also argues an alternative rationale for the search of the pick-up bed was due to exigent circumstances. Under the "exigent circumstances" exception, "the warrant requirement is suspended 'when--in the press of circumstances beyond a police officer's control--lives are threatened, a suspect's escape looms, or evidence is about to be destroyed.'"  **United States v. Johnson**, 12 F.3d 760, 764 (8th Cir. 1993) (citations omitted). "The exigent circumstances exception to the warrant requirement is narrowly drawn." **United States v. Ball**, 90 F.3d 260, 263 (8th Cir. 1996). The government bears the burden of establishing that exigent circumstances existed.  **Id.**  An exigency must be assessed in light of the totality of the circumstances.  **United States v. Wihbey**, 75 F.3d

761, 765 (1st Cir. 1996). The critical time for determining whether an exigency exists "is the moment of the warrantless entry by the officers onto the premises of the defendant." ***United States v. Morgan***, 743 F.2d 1158, 1162 (6th Cir. 1984). The exigent circumstances inquiry is limited to the objective facts of what a reasonably experienced police officer would believe at the time of the search. ***United States v. Kuenstler***, 325 F.3d 1015, 1021 (8th Cir. 2003).

Officer Kennan, an experienced officer in investigating methamphetamine labs, testified that a strong odor of anhydrous ammonia is indicative of such a lab. "The dangers created by methamphetamine labs can justify an immediate search because of exigent circumstances '[d]ue to the volatile nature of such labs.'" ***United States v. Lloyd***, 396 F.3d 948, 954 (8th Cir. 2005) (**citing *Kleinholz***, 339 F.3d at 677). Officer Kennan was entitled to conduct a limited search without a warrant to determine the presence of volatile chemicals used in a methamphetamine lab operation. **See *United States v. Walsh***, 299 F.3d 729, 734 (8th Cir. 2002).

Thus, Officer Kennan did not violate Marasco's Fourth Amendment rights in searching the bed of the pick-up and seizing the items found as Officer Kennan had probable cause of ongoing criminal activity and the area to be searched was a motor vehicle. Furthermore, Officer Kennan's beliefs concerning the odor he detected constituted exigent circumstances under which he could conduct the search of the pick-up bed under his community caretaker functions of a police officer when dealing with such volatile materials. Such functions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." ***Cady v. Dombrowski***, 413 U.S. 433, 441 (1973); ***United States v. Smith***, 162 F.3d 1226 (8th Cir. 1998).

### B. May 20, 2005 Search of the Residence at 720 1st Avenue

The search of the residence at 720 1st Avenue in Plattsmouth on May 20, 2005, was conducted pursuant to a search warrant issued by a judge of the Cass County Court. Marasco asserts the affidavit in support of the search warrant did not contain sufficient probable cause for the issuance of the warrant.

An affidavit for a search warrant must contain probable cause of four ingredients: time, crime, objects, and place. 2 Wayne R. LaFave, **Search and Seizure**, § 3.7(d) at 412 (4th ed. 2004). As the Supreme Court stated in **Illinois v. Gates**, 462 U.S. 213, 238 (1983): "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." **Id.** Thus, when viewing a search warrant, the court must look at the totality of the circumstances set forth in the affidavit. **See id.**; **United States v. Etheridge**, 165 F.3d 655, 656 (8th Cir. 1999). "The duty of the judge issuing a search warrant is to make a 'practical, common-sense decision' whether, considering all the circumstances, a reasonable person could have reason to suspect that evidence would be discovered. . . . Probable cause is a fair probability that contraband evidence of a crime will be found in the location to be searched." **United States v. LaMorie**, 100 F.3d 547, 552 (8th Cir. 1996). **See Gates**, 462 U.S. at 238.

In his affidavit, Detective Walker based his request for a search warrant on the results of a trash pull on May 18, 2005. Detective Walker asserted:

> On May 18th, 2005 Det. Walker conducted a trash pull at 720 1st Ave. Plattsmouth, Cass County, NE. With the assistance of a trash company, Det. Walker recovered (10) large plastic trash bags, and (4) smaller plastic trash bags.
>
> Det. Walker, Det. Smith, and Inv. Watson conducted a hand search of the trash bags and located the following items: a Newport Lights cigarette box containing 1 corner from a plastic sandwich bag, 2 yellow plastic ziplock baggies, 1 clear plastic ziplock bag; items of venue for Aleta Stalbosky; items of venue for Jerry J. Buechler; item of venue for Marasco; item of venue for Richard Marasco, 2 pieces of clear rubber tubing; 1 empty 32oz. can of Acetone; 2 cut white with blue striped straws; 2 cut white hollow pen tube casings; 5 strips of burnt tin foil; a letter scale; 1 hollow Bic pen tube with residue.
>
> Det. Smith field-tested the Bic pen tube, which revealed a positive presence of Methamphetamine.

14

**See** Exhibit 1. Other than the results of the trash pull, Detective Walker set forth his experience in drug investigations, the significance of the items found in the trash pull, and venue matters. Marasco asserts the trash pull, *per se*, which constituted the cornerstone for probable cause did not justify the issuance of the search warrant.

The Eighth Circuit has repeatedly held that affidavits for search warrants based entirely upon evidence garnered from garbage may be sufficient for the issuance of a search warrant for the premises. **See *United States v. Hernandez-Leon***, 379 F.3d 1024, 1028 (8th Cir. 2004); ***United States v. Sumpter***, 669 F.2d 1215, 1221 (8th Cir. 1982); ***United States v. Reicherter***, 647 F.2d 397, 398 (3d Cir. 1981); ***Magda v. Benson***, 536 F.2d 111, 112 (6th Cir. 1976). For example, the discovery of marijuana seeds and stems in the defendant's trash was alone sufficient to establish probable cause to search a house in ***United States v. Briscoe***, 317 F.3d 906, 908-09 (8th Cir. 2003).

Even assuming *arguendo*, that probable cause was lacking in sufficiency, the ***Leon*** good faith exception would allow the admissibility of the evidence seized. **See *United States v. Leon***, 468 U.S. 897 (1984). In ***Leon***, the Supreme Court held that "evidence obtained pursuant to a search warrant should not be excluded where the officers executed the warrant 'with an objectively reasonable reliance on the magistrate's determination of probable cause.'" ***United States v. LaMorie***, 100 F.3d 547, 555 (8th Cir. 1996). There are four exceptions to this good faith rule:

> (1) where the issuing judicial officer was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing officer "wholly abandoned his judicial role;" (3) where the affidavit supporting the warrant contained so few indicia of probable cause "as to render official belief in its existence entirely unreasonable;" and (4) where the warrant itself is so facially deficient that no executing officer could reasonably presume it to be valid.

*Id.* (internal citations omitted). None of those exceptions are present in this case. Marasco's objections to the affidavit in this case should be rejected and his motion to suppress the evidence seized from 720 1st Avenue on May 20, 2005, should be denied.

### C.  Search of Room 12, Offutt Motor Court on August 24, 2005

Both Marasco and Harms assert there was no valid consent for the police officers to search Room 12 of the Offutt Motor Court on the evening of August 24, 2005.  The government asserts otherwise and also asserts there were exigent circumstances warranting the search of the motel room.  Further, the government asserts some of the items seized were within plain view or on Marasco incident to Marasco's arrest.

#### 1.  Items in Plain View

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *United States v. Beatty*, 170 F.3d 811, 814 (8th Cir. 1999).  When the police officers were legally in Room 12 to place Marasco under arrest, they observed in plain view the following: Item W-5 (3 glass pipes, foil, and a blue plastic scale with residue observed on the night stand), Item W-19 (a plastic 2-quart pitcher containing a blue liquid observed next to the sink along the wall); and Item W-7 (used coffee filters containing residue observed on a table by a TV against the wall).  The officers were legally inside the room to arrest Marasco and observed the above-mentioned items in plain view.  Those items were seized and are admissible in evidence against both Marasco and Harms.

#### 2.  Items Seized Incident to Marasco's Arrest

Contemporaneously with Marasco's arrest on the outstanding warrant, the officers could search Marasco's person and that area under his immediate control where he might obtain a weapon or destroy evidence.  *Chimel v. California*, 395 U.S. 752 (1969).  Thus the items seized from Marasco's pockets, Item W-1 (plastic bags containing methamphetamine) and Item W-2 (leather pouch containing methamphetamine and marijuana), are readily admissible in evidence.  Those items are admissible in evidence regardless of any consent issue pertaining to the search of Room 12.

### 3. Marasco's Consent to Search Room 12

A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion. *United States v. Johnson*, 58 F.3d 356, 357-58 (8th Cir. 1995). Furthermore, the government must establish the voluntariness of the consent by the preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 171 (1974); *United States v. Miller*, 20 F.3d 926, 930 (8th Cir. 1994). Some characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. *United States v. Hathcock*, 103 F.3d 715, 719-20 (8th Cir.), **cert. denied**, 117 S. Ct. 2528 (1997). The court can also look at the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual stood by silently while the search occurred. *Id.*

From the evidence presented at both hearings, the court finds Marasco's consent to be voluntarily given. Marasco argues that even if his consent was voluntarily given, Harms did not give consent to search the room. Marasco argues since Harms was present and objected, her objection precluded the search of the room as to any occupant under the recent Supreme Court decision in *Georgia v. Randolph*. Marasco misconstrues the holding in *Georgia v. Randolph*. Therein Justice Souter wrote:

> The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. The question here is whether such an evidentiary seizure is likewise lawful with the permission of one occupant while the other, who later seeks to suppress the evidence, is present at the scene and expressly refuses to consent. We hold that, in the circumstances here at issue, a physically present co-

> occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid <u>as to him.</u>

*Georgia V. Randolph*, 126 S.Ct. at 1518 (internal citations omitted) (emphasis added). Accordingly, while Harms may have objected or refused consent to search the room, the evidence is still admissible against Marasco who voluntarily consented to the search.

### 4. Harms's Consent to Search Room 12

When asked for consent to search Room 12, Officer Simones testified as to Harms reply: "I can't say that this was an exact quote, but it was very similar to I would rather not have you looking through <u>my stuff</u>" (TR. 67-68) (emphasis added). **See also** TR. 103-104. Ordinarily, the search of the room with the consent of the co-occupant Marasco would lead to the admission of the evidence found against both Marasco and Harms. However, since *Georgia v. Randolph*, the evidence found in the room would not be admissible against Harms if she objected to the search. In this case, Harms only objected to the search of "her stuff." While Harms did not specifically consent to the search of the rest of the room other than "her stuff," Marasco's consent to search the entire room would suffice for the officers to search the room and such evidence, other than from "her stuff," would be admissible against both Marasco and Harms. **Compare** *Florida v. Jimeno*, 500 U.S. 248 (1991). When asked if there were any items in the room that readily appeared to belong to Harms, Sergeant Wood stated that there was a purse lying on the bed and there were some craft-type items along the west wall (TR. 93). Any items seized from Harms' purse would not be admissible against her. Examining the items from the inventory (Exhibit 2) in light of the officers' testimony concerning the seizure, the courts concludes the evidence must resolve in favor of Harms that "her stuff" could constitute those items noted in Items W-3, W-4, W-9, W-18, and W-21. Such items would be inadmissible against her. The remaining items would be admissible against her.

### 5. Harms's Statements

Harms was advised of her *Miranda* rights by Detective Simones. Harms does not dispute such advice, nor does she fault the adequacy of the advice (TR. 73-74). Harms

only asserts her statements were the fruit of the poison tree, i.e., the illegal search of "her stuff." As such the statement should be excluded under *Wong Sun v. United States*, 371 U.S. 471 (1963). Based on Detective Simones testimony that after being told by Sergeant Wood that there were some items in the room that were drug related and that such items were linked to Harms, he advised Harms of her *Miranda* rights. The court finds Harms's statement to be the product of an illegal search as to "her stuff." Accordingly, Harms's statement should be excluded from evidence under *Wong Sun*.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that**:

1) Marasco's motion to suppress (Filing No. 24) be denied; and

2) Harms's motion to suppress (Filing No. 26) be granted as to Items W-3, W-4, W-9, W-18, and W-21 seized from Room 12 of the Offutt Motor Court on August 24, 2005, as described in Exhibit 2 of the supplemental evidentiary hearing, granted as to Harms's statement made to Detective Simones on August 25, 2005, but otherwise denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to the Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of the Report and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 2nd day of May, 2006.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge